NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MICHAEL T. MAYO,

                Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

Civ. No. 06-03204 (DRD)

**O P I N I O N**

*Appearances:*

LANGTON & ALTER, ESQS.
By: Abraham S. Alter, Esq.
2096 St. Georges Avenue
P.O. Box 1798
Rahway, NJ 07065

    *Attorney for Plaintiff*

CHRISTOPHER J. CHRISTIE
UNITED STATES ATTORNEY for the District of New Jersey
By: Som Ramrup, Esq.
C/O Social Security Administration
Special Assistant U.S. Attorney
26 Federal Plaza, Room 3904
New York, NY  10278

    *Attorney for Defendant*

**DEBEVOISE, Senior District Judge**

Plaintiff, Michael T. Mayo, pursuant to section 205(g) of the Social Security Act (the "Act"), seeks this Court's review of the Commissioner of Social Security's (the "SSA") final decision that Plaintiff is not entitled to a period of disability, Disability Insurance Benefits, and Supplemental Security Income Benefits (all benefits combined hereinafter as "Benefits") under sections 216(i), 223, and 1614(a)(3) of the Social Security Act. Plaintiff seeks reversal of the SSA's decision on the grounds that the Administrative Law Judge ("ALJ") committed legal errors in reaching this decision and that the ALJ's conclusions are not supported by substantial evidence. The deficiencies in the ALJ's analysis are so glaring it is surprising that the SSA did not consent to a remand. For the reasons set forth below, the SSA's decision will be reversed and remanded.

## I. BACKGROUND

Plaintiff is a 42-year old man and has been diagnosed with Crohn's disease of the colon since the age of 13. (R. at 12-13.) He alleges that he has become disabled due to the disease since May 1, 2003. (R. at 12.) Crohn's disease carries symptoms of diarrhea, weight loss, anemia, and malnutrition. (R. at 13, 104.) It is also known to have remissions and exacerbations. (R. at 119.) In addition to the said physical ailments, Plaintiff also alleges mental disability resulting from prolonged steroid treatments for Crohn's disease. (R. at 13.) Plaintiff has been hospitalized four times in Saint Barnabas Medical Center and at various times has been diagnosed with psychotic disorder NOS (R. at 122), steroid induced psychosis (R. at 152), co-morbid psychiatric disorder (R. at 153), and schizophrenia (R. at 261-62).

Prior to Plaintiff's application in 2003, he worked as a courier for various employers. (R.

at 62.) He has not been engaged in substantial gainful employment since May 1, 2003. (R. at 13.) After having had earlier periods of Benefits, Plaintiff reapplied for Benefits on October 7, 2003. (R. at 43-45.) On September 6, 2005, after his application for benefits and subsequent reconsideration request were denied (see R. at 24-27, 32-35), Plaintiff appeared before the Honorable Richard L. Desteno, ("ALJ"), (R. at 363). On November 15, 2005, the ALJ issued a decision that Plaintiff was not entitled to Benefits. (R. at 12-20.)

In rendering his determination, the ALJ heard the testimony of Plaintiff and Plaintiff's mother, Val Ortiz, and considered medical evidence submitted by Plaintiff and independent sources. Medical records confirm that Plaintiff suffered symptoms of his Crohn's disease in April of 2003. (R. at 13.) Plaintiff's gastroenterologist, Dr. Desai, submitted records of significant weight loss between April 4, 2003 and September 11, 2003: the worst being 102 pounds in September 2003 with a height of five feet six inches. (R. at 13-14.) However, on November 17, 2003, Dr. Tiersten examined Plaintiff at the request of the Administration, and reported a contradicting diagnosis. (R. at 14.) Dr. Tiersten reported that Plaintiff was, at that time, in complete remission for one year and weighed 128 pounds. (R. at 117.)

The ALJ also considered medical records in connection with Plaintiff's alleged mental disability. (R. at 14.) Medical records show that Plaintiff was institutionalized twice within two months in 1998. Id. The first admission lasted five days, beginning March 8, 1998, where Plaintiff was treated for psychosis "characterized by bizarre and paranoid behavior, agitation, delusional thinking and religious preoccupation." Id. Plaintiff was hospitalized again for nine days beginning April 26, 1998, when he was diagnosed with paranoid schizophrenia (R. at 14, 262.) On discharge, Plaintiff "was referred to Partial Hospitalization Program as well as further

3

medical treatment with Dr. Desai." (R. at 262.) Dr. Desai recommended psychiatric treatment, but Plaintiff did not go. (R. at 405.)

At the request of the Administration, Plaintiff was examined by Dr. La Manna on November 25, 2003. (R. at 120.) The ALJ noted that Dr. La Manna's report stated a psychotic disorder by history but otherwise his mental status appeared within normal limits. (R. at 14.) However, the report also stated that Plaintiff appeared defensive, guarded, and irritable. (R. at 121.) Dr. La Manna reported that Plaintiff's "manner of relating and overall presentation was poor and characterized by defensiveness and a lack of affective reactivity. He also appeared to be somewhat irritable." Id. Plaintiff was appropriately dressed and adequately groomed, however he had poor eye contact and had oddities in his word choice. Id. Dr. La Manna observed that Plaintiff's attention and concentration was mildly impaired, recent and remote memory skills adequate, and had a below average intellectual functioning. (R. at 122.) Plaintiff "appear[ed] able to follow and understand simple directions and instructions . . . [and] is able to perform simple rote tasks. Id. Although Plaintiff is capable of learning and performing new tasks, "he may have difficulty making appropriate decisions [and] . . . relating adequately with others." Id.

After considering the medical reports and the hearing testimony, the ALJ issued a decision denying Plaintiff's request for Benefits. (R. at 20.) Critical to the ALJ's decision in his finding that "[t]he claimant's mental impairment is a 'non-severe' impairment." (R. at 19.) The ALJ's findings of fact and conclusions of law were included in the decision and are discussed below.

Plaintiff timely appealed the ALJ's decision to the SSA's Appeals Council. (R. at 7-8.)

The Appeals Council denied Plaintiff's request for review, thereby making the ALJ's decision the final decision of the SSA. (R. at 4.) It is from the ALJ's opinion, as the final decision of the SSA, that Plaintiff now seeks review.

## II. DISCUSSION

The only issue before the Court is whether the SSA's decision to deny Plaintiff's application for Benefits is supported by substantial evidence. Plaintiff asserts that the ALJ erred by ignoring substantial evidence of his psychiatric impairment, by failing to determine whether his psychiatric impairment was severe, by determining that Plaintiff possesses the residual capacity to engage in the full range of medium work, and by determining that Plaintiff was able to perform past relevant work. A review of the case law and the administrative record shows that the ALJ's conclusion that Plaintiff's mental impairment was not severe was erroneous as a matter of law, and, therefore, the ALJ's conclusion as to Plaintiff's ability to perform past relevant work is not supported by substantial evidence and remand is necessary.

**A. Standard of Review**

A district court's review of the SSA's factual conclusions is deferential and limited to determining whether the conclusions are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). A district court is bound by the SSA's factual findings that are supported by substantial evidence, even if the district court would have reached a different factual conclusion. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). A district court, however, exercises plenary review of all legal issues in a case. Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000).

**B. Determination of Disability**

Under the Social Security Act, disability insurance benefits are provided to individuals who are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). To constitute a disability, the impairment must be "expected to result in death" or "last for a continuous period of not less than 12 months," § 423(d)(1)(A), and be "of such severity that [the individual] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work," § 423(d)(2)(A).

An ALJ determines whether an individual is disabled and therefore entitled to disability insurance benefits by using a five-step evaluation process. See 20 C.F.R. § 404.1520(a). A finding by the ALJ at any of the steps that the individual is either disabled or not disabled ends the inquiry. The five stages of inquiry proceed as follows.

*Step 1: Substantial Gainful Activity.* The ALJ must first determine whether the claimant is engaging in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(*i*). Substantial gainful activity is work activity that involves doing significant mental or physical activity for pay or profit. 20 C.F.R. § 404.1572. If the ALJ finds that the claimant is engaging in substantial gainful activity, then the ALJ must find that the claimant is not disabled. § 404.1520(a)(4)(*i*).

*Step 2: Severity of Impairment.* If the claimant is not engaged in any substantial gainful activity, the ALJ must then determine the medical severity of the claimant's impairments. 20 C.F.R. § 404.1520(a)(4)(*ii*). An impairment is severe when it significantly limits the individual's physical or mental ability to do basic work activities. § 404.1520©. If the ALJ finds that an individual's impairment is not severe or has not met the 12 month durational requirement, then

6

the ALJ must find that the claimant is not disabled.  § 404.1520(a)(4)(*ii*).

*Step 3: Listed Impairments.*  If the ALJ determines that the claimant's impairment is severe, then the ALJ compares the medical evidence of the impairment to a list of impairments in Appendix 1 of 20 C.F.R. Part 404, Subpart P.  20 C.F.R. § 404.1520(a)(4)(*iii*).  The impairments listed in Appendix 1 are presumed severe enough to preclude substantial gainful activity.  If the ALJ finds that the individual's impairment is listed in Appendix 1 and has met the 12 month durational requirement, then the ALJ must find that the claimant is disabled.  § 404.1520(a)(4)(*iii*).

*Step 4: Residual Functional Capacity.*  If, however, the individual's impairment is not listed in Appendix 1, then the ALJ must consider whether the claimant possesses the residual functional capacity to do his past relevant work.  20 C.F.R. § 404.1520(a)(4)(*iv*).  Residual functional capacity covers those activities that an individual is still able to do despite the limitations caused by his impairment.  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000).  If the ALJ finds that the individual has the capacity to perform past work, then the ALJ must find that the claimant is not disabled.  § 404.1520(a)(4)(*iv*).

*Step 5: Adjustment to Other Work.*  If the claimant cannot perform past work, then the ALJ must consider the individual's residual functional capacity, age, education, and work experience to determine whether the claimant can perform other work.  20 C.F.R. § 404.1520(a)(4)(*v*).  Other work includes "any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A).  If the ALJ finds that the individual has the

capacity to adjust to other work, then the ALJ must find that the claimant is not disabled. § 404.1520(a)(4)(*v*). However, if the ALJ finds that the individual cannot adjust to other work, then the ALJ must find that the claimant is disabled. Id.

While the individual claimant bears the burden of persuasion on steps one through four, the burden shifts to the SSA on the fifth step. At the fifth step, the SSA must prove that the individual is capable of obtaining gainful employment other than his past relevant work and that jobs, which the individual can perform, exist in substantial numbers in the national economy. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

**C. The SSA's Findings and Conclusions**

In the present case, the ALJ applied the five step analysis and concluded at the first step that Plaintiff was not engaging in any substantial gainful activity. (R. at 13.) At the second step, the ALJ determined that Plaintiff's Crohn's disease was severe, however his mental impairment was not. Id. Plaintiff challenges the conclusion at the second step that the mental impairment was not severe, arguing that the ALJ's reasoning did not take all substantial evidence into consideration. (Pl.'s Br. at 13.) Plaintiff further argues that due to his error at the second step, the ALJ's determination at later steps were "detached from the substantial evidence of record." Id. At the third step, the ALJ determined that Plaintiff's Crohn's disease was not severe enough to meet any of the listed impairments in Appendix 1 of 20 C.F.R. Part 404, Subpart P because the gastrointestinal impairment was not combined with any requisite objective clinical findings, diagnostic test results, and secondary complications. (R. at 13.)

At the fourth step, the ALJ considered Plaintiff's residual functional capacity and concluded that Plaintiff retained the ability to perform the full range of medium work activity and

to perform past relevant work. (R. at 13-19.) In reaching this conclusion, the ALJ relied upon consultative evaluations by Dr. Tiersten and Dr. La Manna, which were supported by Plaintiff's Residual Functional Capacity Assessment and the evaluation of Dr. Desai, Plaintiff's treating physician; a Psychiatric Review Technique form; and Plaintiff's subjective symptomatology and overall credibility.

Plaintiff contends that the ALJ erred in reaching the conclusion that Plaintiff was able to perform past relevant work because the ALJ discredited the opinion of Plaintiff's treating physician, misconstrued the opinion of the independent examination of Dr. La Manna, and did not consider the assertion that Dr. La Manna was not only incapable of determining the symptoms of schizophrenia, but the doctor was also not provided with any background information on Plaintiff to work with. Determining that Plaintiff was capable of returning to his past relevant work as a food deliverer, the ALJ did not consider the fifth step. (R. at 19.)

The Court concludes that the ALJ's finding that Plaintiff has the ability to engage in the full range of the medium activity work level is not supported by substantial evidence, and consequently, that the ALJ's further finding that Plaintiff has the ability to perform past relevant work was reached in error. The ALJ's fundamental error was the ALJ's unsupportable finding that Plaintiff's mental impairment was not severe and failing to consider it along with the Crohn's disease impairment at each step after step two. Therefore, the case must be remanded for further proceedings.

*(1) The ALJ's Conclusions at Step Two Regarding The Severity of Plaintiff's Mental Impairment*

The ALJ concluded that "the medical record indicates that [Plaintiff] has not had any

significant non-exertional limitations" therefore "[t]he evidence fails to establish a 'severe' mental impairment." (R. at 18.)  With regards to the evidence of past psychosis, the ALJ dismissed it because it was "from many years ago" and there was "no evidence of any mental impairment since 1998." Id.  The ALJ draws this conclusion by considering the medical records from Saint Barnabas Medical Center and Dr. La Manna's examination.

In fact, the two prior hospitalizations in a psychiatric institution and Dr. La Manna's examination both show substantial evidence that Plaintiff's mental impairment was severe within the meaning of the Regulations.  What the record shows, in summary, is that after leaving school Plaintiff married and moved to Virginia with his wife and their son, born before the marriage. (See R. at 375, 392.)  Plaintiff's wife telephoned his mother, informing her that Plaintiff was assaulting her, that she had to call the police, and that she wished the mother to take her son home so that she would not have to commit him in Virginia, away from his family. (R. at 392-93.)

That occurred in 1998 and resulted in the hospitalization at Saint Barnabas, where Plaintiff's violent and irrational behavior was diagnosed and treated. (R. at 394.)  The medical records reflect that Plaintiff's bizarre behavior was caused by excessive dosages of prednisone which was administered to treat his Crohn's disease. (R. at 169-70.)  The dosage was adjusted and Plaintiff's extreme irrational conduct was modified.  Id.  However, there is strong evidence that residual effects of the years of prednisone overdose remained.  Id.  Plaintiff went to live with his mother.

Plaintiff's own testimony evidenced that he is mentally impaired.  He has a positive view of his physical and mental condition, although he remains in his mother's home all day except for

occasional visits to stores. (R. at 382-84.) He has absolutely no friends. (R. at 384.) He testified totally illogically that, because loss of weight is a feature of Crohn's disease, he can get a job when his weight goes up to 220 pounds, a weight he has never approached. (R. at 384-85; see R. at 398.)

Plaintiff's mother's testimony, which the ALJ found credible, describes Plaintiff's present emotional state.

> When he was in, I think the last time he was in St. Barnabas psychiatric, the doctor told me he was diagnosed as primarily schizophrenic. And his behavior has been very erratic, on and off . . . And he, he can't live alone. I had to take a leave of absence from my job to stay with him, to supervise him. But at this time, he's docile . . . He walks around the house, stands in the doorway, looks out the door, watches TV with the sound down. He laughs and to himself. Throws things away. His behavior, good clothes, he doesn't have any clothes. He hasn't had a pair of shoes for two years because he threw them all out . . .
>
>    Good, good clothes, clothes in good condition that he can fit. For some reason, he throws them away. His mind tells him to throw things away . . . He throws food away . . .
>
>    . . . And so he, it's his mind, he doesn't think rationally. He says things off the wall. He doesn't make sense a lot of the times.
>
>    . . . .
>
>    . . . does not eat. He does not do that on a regular basis. He eats his food kind of weird. He'll eat some vegetables today, meat tomorrow. See, all day today, he'll eat all vegetables. Tomorrow, he'll eat all meat . . .
>
>    . . . But, his showers, I have to, he'll go two weeks without a shower unless I tell him to shower. He doesn't think about showering. He doesn't do that on a regular basis.
>
>    . . . .
>
>    . . . But, I don't really think he could hold down a job. His mental capacity, he doesn't, I'll send him, I'll ask him . . . I try to send him on simple errands. Every time I send to the store, he comes back with the wrong thing. And

> I'm always have to turn around and go myself.  And when I send him to the, I live like four blocks from a store, and when I ask him to go, he has to go five miles to a store . . .
>
> . . . .
>
> . . . I think twice I had to call the police because he got really agitated with me because I refused to give him money, because he wastes money . . . And they said we could take him away, you know.  But then the police talked to him and he promised to calm down . . .
>
> . . . .
>
> He refuses to go.  That's, I've been trying to get him treatment.  I can't make him . . . And that's the problem I have about getting treatment.  If he doesn't go on his own, I have no way to force him into evaluation.
>
> . . . .
>
> He walks back and forth from the front of the house, stands in the hallway looking out in the, I have a little foyer.  He stands there and looks out the door all day.  All my friends says, oh, I rode by.  I always see Michael in the door.  That's all he does is stand in the door.

(R. at 394-402.)

The Social Security Regulation defines a severe impairment in the negative, by listing what is not considered a severe impairment.  See 20 C.F.R. 404.1521.  "An impairment . . . is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. 404.1521.  Such activities include mental abilities to hear and speak, understand, carry out and remember simple instructions, use proper judgment, respond appropriately to supervision, coworkers, and in usual work situations, and deal with changes in a routine setting.  Id.  Besides the fact that Plaintiff is a diagnosed paranoid schizophrenic, the Administration's own independent examination by Dr. La Manna also suggests a severe mental

impairment.  (See R. at 120.)  The report read that Plaintiff's language usage was questionable, his mood irritable and defensive, and he may have difficulty making appropriate decisions and in relating to others.  (R. at 122.)  Thus, Plaintiff's ability to use proper judgment and respond appropriately to those around him appears significantly limited.  However, no mention of these observations or of Ms. Ortiz's testimony were mentioned in the ALJ's determination.

An ALJ must document its analysis and must not ignore any evidentiary conflicts or countervailing evidence.  See Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir.1981).  An ALJ has an obligation to discuss all evidence, whether it is considered or rejected in the analysis; otherwise this Court will not be able to determine whether certain evidence was considered or simply ignored.  Cotter, 642 F.2d at 705.  Unless the ALJ analyzes all evidence and adequately explains why he places more weight on some evidence over others, the court will not be able "to scrutinize the record as a whole to determine whether the conclusions reached are rational."  Dobrowlosky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979) (quoting Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)).

In the present case, the ALJ's discussion of the evidence does not show a thorough consideration of the evidence.  He does not objectively analyze Dr. La Manna's report, dismisses the Saint Barnabas Medical Center reports, and does not reflect on the credible testimony of Plaintiff's mother in any informative way.

*(2) The ALJ's Conclusions at Step Four*

What the ALJ did in the case was to find Plaintiff's mental impairment not severe in total disregard of the record.  He then made his step four evaluation based solely on the evidence relating to the effects of Plaintiff's Crohn's disease.  It is true that there is substantial evidence to

support a finding that the Crohn's disease is in remission and that the physical limitation resulting from the Crohn's disease alone would not preclude Plaintiff from engaging in his past relevant work. But such a finding is totally worthless in light of the fact that, when making it, the ALJ did not consider Plaintiff's more serious impairment - his mental impairment.

Specifically, the ALJ noted that Plaintiff was capable of "lifting and carrying objects weighing up to 50 pounds; frequently lifting and carrying objects weighing 25 pounds; standing, walking and sitting up to 6 hours in an 8-hour workday; pushing and pulling arm and leg controls; and the full range of medium work." (R. at 18.) The ALJ then determined that Plaintiff's past work as a food deliverer met such requirements. (R. at 18-19.) While there may be evidence in this record to support these findings, it is inadequate to support the ALJ's step four conclusion, because the serious mental impairment was totally ignored.

### III. CONCLUSION

For the reasons set forth above, the determination of the SSA will be reversed and the case remanded for reconsideration in accordance with this opinion. An order implementing this opinion will be entered.

    /s/ Dickinson R. Debevoise
    DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: April 1, 2008